IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2002 Session

## KEN STEPHENS v. ROANE STATE COMMUNITY COLLEGE

**An Appeal from the Chancery Court for Davidson County**
**No. 97-2695-I    Irvin H. Kilcrease, Jr., Chancellor**

---

**No. M2001-03155-COA-R3-CV - Filed August 12, 2003**

---

This is a sexual harassment case. The plaintiff was a tenured professor at the defendant college. In 1996, one of the professor's students filed a complaint of sexual harassment with the college, alleging that the professor engaged in unwelcome sexual conduct and created a hostile educational environment. After a hearing, an administrative law judge determined that the professor had committed the acts charged. Consequently, the professor was suspended without pay for six months. The professor appealed the administrative decision to the trial court. The trial court upheld the decision, using a deferential standard of review, and the professor filed the first appeal in this case. On appeal, this Court reversed and remanded for a review *de novo* on the record. On remand, the trial court reviewed the case *de novo* on the record and again upheld the ALJ's decision. The professor now appeals. We affirm, finding that the trial court did not abuse its discretion in refusing to allow the professor to testify in person at the rehearing on remand, and that the trial court did not err in finding that the ALJ's decision was supported by clear and convincing evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Samuel W. Brown, Knoxville, Tennessee, for the appellant, Ken Stephens.

Paul G. Summers, Attorney General and Reporter, and William J. Marett, Jr., Assistant Attorney General, Nashville, Tennessee, for the appellee, Roane State Community College.

**OPINION**

Plaintiff/Appellant Ken Stephens ("Stephens") was hired by Defendant/Appellee Roane State Community College ("College") in 1989 to teach computer programming.[1] He became a tenured professor in 1991.

The Tennessee Board of Regents ("Board of Regents") has enacted Policy No. 2:02:10:01, Nondiscrimination on the Basis of Sex in Education Programs and Activities, and Policy No. 5:01:02:00, Equal Employment Opportunity, Affirmative Action, Discrimination and Nepotism, which clearly prohibits sexual harassment. To supplement this policy, the Board of Regents issued Guideline P-080, which defines sexual harassment as:

> Generally, sexual harassment may be defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or educational experience or creating an intimidating, hostile or offensive work or educational environment.

The Board of Regents Guideline included a nonexclusive list of examples of behavior that may constitute sexual harassment, including:

– Refusing to hire, promote, or granting or denying certain privileges because of acceptance or rejection of sexual advances.

– Promising a work-related benefit or a grade in return for sexual favors.

– Suggestive or inappropriate communications, notes, letters, or other written materials displaying objects or pictures which are sexual in nature that would create hostile or offensive work or living environments

– Sexual innuendoes, comments, and remarks about a person's clothing, body or activities

– Suggestive or insulting sounds

– Humor and jokes about sex that denigrate men or women

– Implied or overt sexual threats

– Suggestive or obscene gestures

---

[1]Many of the pertinent facts can be found in the Opinion issued in the first appeal of this case, *Stephens v. Roane State Community College*, No. M1998-00125-COA-R3-CV, 2000 WL 192577 (Tenn. Ct. App. Feb. 18, 2000).

– Patting, pinching, and other inappropriate touching

– Unnecessary touching or brushing against the body

Board of Regents Guideline P-080.

The College also adopted a policy prohibiting sexual harassment, Policy PA-02-01 which defines that term in language identical to that in the Board of Regents guideline. The College's policy adds language stating that "[w]hether the alleged conduct constitutes sexual harassment depends upon the record as a whole and the totality of the circumstances, such as the nature of sexual advances in the context within which the alleged incident occurred."

The College conducts sexual harassment training sessions at its annual faculty in-service training and at other times of the year. The President of the College issues memos annually, informing staff members of the policy of prohibiting sexual harassment. Stephens does not contend that he was not aware of the sexual harassment policies or that he was not governed by them.

Layla Williams ("Williams") was a seventeen-year-old female student at the College. She was enrolled in professor Stephens' spring 1996 FORTRAN class.[2] In 1996, Williams filed a formal complaint with the College, claiming that Stephens engaged in unwelcome sexual conduct and created a hostile educational environment while acting in his official capacity as a professor. Williams' complaint was investigated by the College's Affirmative Action Officer, Kathy Gethers. Gethers determined that there was sufficient evidence to support Williams' allegations. Based on Gethers' report and recommendation, the President of the College imposed a sanction against Stephens of suspension without pay for one academic year, from August 12, 1996, through May 9, 1997. Stephens appealed to the Board of Regents and requested an administrative hearing, pursuant to the Tennessee Uniform Administrative Procedures Act, Tennessee Code Annotated § 4-5-101, *et seq.* ("UAPA").

Hearings were held before the administrative law judge ("ALJ") on October 16 and 17, 1996, and on January 13, 1997. Williams testified at the hearings. She said that, on approximately February 26, 1996, she had an appointment with Stephens at 1:00 p.m. to discuss one of his lectures on the concept of memory locations. When she realized that she had a scheduling conflict, Williams went to Stephens' office at about 12:30 p.m. to reschedule her appointment. While she was there, Williams said that Stephens asked her to have a seat. Stephens asked her to explain the topic of the appointment, and Williams responded that it was memory locations. Stephens responded by utilizing an analogy concerning women's bras and panties. Williams testified that when Stephens made the remark about women's undergarments, he slumped down in his chair, spread his legs apart, and rubbed his upper thighs. His remark and his behavior made Williams uncomfortable, so she attempted to leave his office. Stephens detained Williams, asking her how many toothbrushes were in her bathroom. Williams interpreted this question as being designed to discover her living

---

[2]FORTRAN is a computer programming language, and the purpose of the class was to learn that language.

arrangements. She told Stephens that she had two toothbrushes, one for her and one for her daughter. Stephens then commented that he liked little girls, and remarked that his wife had a miscarriage when she was pregnant with a daughter. Williams said that when she tried again to leave, Stephens physically stopped her, turned her around by placing his hands on her shoulders, put his arm around her neck, pulled her face to within two inches of his face and said, "[Y]ou cannot go around here with this kiss-my-ass attitude. If you want somebody to scratch your back, you had better be willing to scratch their's in return." Williams did not tell Stephens that his actions were unwelcome and offensive, nor did she attempt to brush his hand away from her neck and shoulders. She then left Stephens' office.

Williams testified about other instances of misconduct by Stephens that occurred after "the office incident." On March 1, 1996, Williams observed Stephens massaging the shoulders of a female student who was sitting next to her in the open computer lab. Williams said that, based on her other experiences with Stephens, she believed that Stephens' massage was sexual in nature. Also after the office incident, Stephens told Williams that he would use her as an example in class of someone who had not previously taken programming classes. This made Williams uneasy in light of the office incident. Williams said that some of the other students began to joke with her about being singled out, remarking, "[I]t's better you than us."

Williams asserted that Stephens also made inappropriate comments during classroom discussions. She claimed that, in one such discussion on the equality of men and women, Stephens pointed out that men could get their wives pregnant, whereas women could not get their husbands pregnant. In another classroom discussion regarding cheating on schoolwork, Stephens used the example that, if he went home with blonde hair, another woman's perfume, and purple lipstick on his clothes, his wife would know that he was cheating. Since Williams has blonde hair and sometimes wore perfume and purple lipstick in class, she felt that Stephens' comments were directed towards her. On another occasion, after Stephens' class ended, he was available and answering questions from students. Stephens allegedly began to discuss with the students, including Williams, whether or not a husband could rape his wife. Williams said that the conversation made her uncomfortable, but the circumstances made it difficult for her to leave.

Evidence was also submitted to show Stephens' awareness of the College's sexual harassment policies. Affirmative Action Officer Gethers testified that, in 1991 and 1994, she advised Stephens that it was inappropriate to touch and massage students. Paul Goldberg, the College's Dean of Continuing Education, testified that, after getting informal complaints from students, he told Stephens that it was inappropriate to use the word "boobs" in the classroom, to relate life experiences containing sexual content, and to hug and touch students. Robert Safdie, Stephens' supervisor at the time of the conduct in question, testified that between 1994 and 1996, he discussed with Stephens the school's prohibition against sexual harassment. He told Stephens that certain classroom comments, as well as hugging and touching of students, could be considered sexual harassment. During that same period of time, prompted by an informal complaint from a student, two fellow professors cautioned Stephens that touching students was inappropriate, and told him that some day a student might object to his conduct.

Williams said that Stephens impeded her class progress by requesting excessive corrections of computer programs. Since she no longer felt comfortable with Stephens, Williams obtained the assistance of a computer programming tutor. Despite the help of the tutor, Williams withdrew from Stephens' FORTRAN course, receiving a grade of "W." Failing to complete the class in the 1996 spring session was detrimental to Williams, because the FORTRAN class was required to complete her pre-engineering program at the College. At the time of her enrollment, the course was offered only once every two years and was taught only by Stephens.

Stephens testified on his own behalf at the administrative hearing. He admitted making several of the comments alleged by Williams. He admitted making the pregnancy analogy, but explained that it was made in a joking manner designed to relax the students. He admitted making the cheating/blonde hair analogy, but said that he did not intend to single out Williams. Stephens noted that he had been using the same cheating analogy for twenty years, and that no one had ever complained about it.[3] Stephens admitted to making the spousal rape comments, but said that the issue was discussed only after class, when Williams was free to leave.

As to the office incident about which Williams testified, Stephens flatly denied that it ever occurred. He testified that he has a lab from 1:30 to 4:15 on Wednesdays, and that he is always present at the lab. He claimed that he never scheduled individual student appointments during labs and, therefore, he could not have been in his office at the time alleged. In addition, Stephens said that he often plays basketball from 12:00 to 1:30 p.m. before his lab. Stephens corroborated this by presenting witnesses who testified as to his general habits on Wednesdays.

Stephens also responded to Williams' testimony about his massaging students. He explained that massaging the female student's shoulders in lab was simply to relax her, and that touching his students was motivated by a desire to provide a supportive, grandfatherly atmosphere for his students, much like a supportive pat by a football coach. He admitted that he had "kneaded" but not "rubbed" the shoulders of various students. Stephens testified that he told his students at the beginning of the year that he might touch their shoulders while they are at a computer, and that no student had ever complained about it before. With respect to his telling Williams that he would use her as an example in class, Stephens said he informed her that he intended to do this so that she would not think he was doing it in retaliation for any behavior on her part. Finally, Stephens commented that Williams was a weak student academically, and that her academic weakness, not his behavior, was the reason that she withdrew from his FORTRAN class.[4]

After considering the "hotly disputed" evidence, the ALJ concluded that Stephens had engaged in conduct constituting sexual harassment, in violation of the policies of the Board of Regents and the College, in that his conduct unreasonably interfered with Williams' academic

---

[3]Two students in Stephens' Fortran class testified that they recalled him making the cheating/blond hair analogy and did not find it sexually hostile or unwelcome.

[4]Stephens pointed out that Williams also dropped algebra based on academic weakness.

performance and created a hostile, intimidating, and offensive educational environment for Williams. The ALJ, however, reduced Stephens' suspension to one-half year without pay. Neither party petitioned the Board of Regents for appeal. Consequently, the Board of Regents did not issue a notice of intention to review the ALJ's order pursuant to Tennessee Code Annotated § 4-5-315, and in June 1997, the ALJ's order became the final order of the Board of Regents. *See Stephens v. Roane State Community College*, No. M1998-00125-COA-R3-CV, 2000 WL 192577, at *1 (Tenn. Ct. App. Feb. 18, 2000) (explaining procedural background).

Stephens then filed a petition with the trial court below for review of the administrative decision. In his petition, Stephens alleged that the Board of Regents had acted in violation of constitutional or statutory provisions, had acted arbitrarily and capriciously, and had abused its discretion by (1) sanctioning him for conduct which, as a matter of law, did not rise to the level of sexual harassment and (2) by refusing to permit Stephens to inquire into the views of Williams' psychologist. Stephens' petition also alleged that the order was not supported by substantial and material evidence in light of the entire record. *Id.* The trial court upheld the decision of the ALJ, applying the standard of review set out in the UAPA, which states that review of administrative decisions should address whether the decision was unlawful, arbitrary or capricious, or not supported by substantial and material evidence.

On the first appeal, this Court reversed the trial court's decision, finding that an erroneous standard of review was applied to the ALJ's decision. *Id.* at *5. The trial court had utilized the "material evidence" standard of review in the UAPA. The appellate court held that the trial court should have applied the standard set out in Tennessee Code Annotated § 49-8-304(a), which provides that review of the suspension of a tenured faculty member should be *de novo*. The appellate decision notes that "[a] court conducting a *de novo* review of administrative proceedings must make an independent examination of the evidence, including any evidence supplemental to the administrative record, and 'redetermine the facts and the law from all the evidence before the court.'" *Id.* at *4 (quoting *Cooper v. Williamson County Bd. of Educ.*, 746 S.W.2d 176, 180-81 (Tenn. 1987)). The appellate decision cites the following language in *Frye v. Memphis State Univ.*, 671 S.W.2d 467 (Tenn. 1984), to further define the duty of the trial court:

> "*De novo* judicial review" in this statute and context means a new hearing in the chancery court based upon the administrative record and any additional or supplemental evidence which either party wishes to adduce relevant to any issue. The Chancellor may, of course, confine new evidence to that which is truly supplemental or additional and is not required to hear all of the evidence anew if he does not find this necessary. Otherwise there would be little need for the administrative transcript. However, he may permit introduction of any and all evidence which he deems necessary to enable him to dispose of the issues presented.

*Frye*, 671 S.W.2d at 469.

Pursuant to the order of remand, on March 22, 2001, Stephens filed a motion to amend his petition for judicial review to request that the trial court review the ALJ's decision under the *de novo* standard of review. Stephens also filed a Motion to Supplement the Record, requesting that he be permitted to testify before the trial court "live and in person" at the hearing on review. He made this request because the ALJ had determined that Williams was more credible than Stephens, in particular with respect to the parties' sharply conflicting testimony regarding the office incident. Stephens explained that he sought to testify in person before the trial court "so that [the trial court] may make a fair determination of the allegations against" him.

On November 13, 2001, the trial court entered an order granting Stephens' motion to amend his petition for judicial review. On that same day, the trial court denied his motion to supplement the record by offering "live and in person" testimony because (1) according to the holding in *Frye*, the trial court was not required to hear the proffered evidence, since Stephens' testimony "would simply be a repetition of his testimony at the administrative hearing"; and (2) the motion to admit Stephens' testimony sought to admit evidence that would violate one of the trial court's previous orders in the case, which stated that "neither party may call any witness who has previously testified at the administrative proceeding and that evidence currently in the record may not be repeated."

On the same day, having conducted a *de novo* hearing and review, the trial court entered a memorandum opinion on the merits of Stephens' petition. The trial court, adopting many of the findings in its previous ruling, affirmed the College's decision to suspend Stephens. The trial court found that the ALJ's decision to suspend Stephens "for six months, without pay, for sexual harassment is supported by clear and convincing evidence." The trial court noted that Stephens was aware of the applicable sexual harassment policies and in fact had been warned since 1991 about improper behavior as it related to sexual harassment. It concluded that Stephens' conduct rose to the level of sexual harassment, and that his harassment "created a hostile educational environment," in violation of the College's policies. The trial court found that the ALJ "properly exercised her discretion in determining that [Stephens'] testimony was not credible and that Ms. Williams['] . . . testimony was credible." Finally, the trial court held that Stephens' punishment, suspension without pay for six months, was not arbitrary or capricious, and that the ALJ did not abuse her discretion with respect to the sanctions imposed. On November 26, 2001, the trial court entered a final order incorporating by reference the November 13 memorandum and dismissing Stephens' petition for review. Stephens now appeals the trial court's decision.

On appeal, Stephens contends that the trial court erred in denying his motion to testify "live and in person" at the *de novo* hearing for the purpose of rebutting the charges made against him. He maintains that the trial court erred in finding that his suspension was supported by clear and convincing evidence, arguing that (1) his conduct, as a matter of law, did not rise to the level required to constitute sexual harassment; that (2) Williams' allegations, on which the charges were based, were completely uncorroborated; and that (3) he had insufficient notice that the College was displeased with his general conduct towards his students.

Because the trial court reviewed the case without a jury, we review the trial court's findings of fact *de novo* upon the record, accompanied by a presumption of correctness, except where the preponderance of the evidence is otherwise. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); Tenn. R. App. P. 13(d). We review questions of law *de novo*, with no presumption of correctness to the trial court's findings in this regard. *Wells*, 9 S.W.3d at 783. We will not overturn a trial court's credibility determinations "absent clear and convincing evidence to the contrary." *Id.*

Stephens first asserts that the trial court erred in denying his motion to testify "live and in person" at the *de novo* hearing on remand. He acknowledges that the trial court's scope of review is governed by *Frye* and *Wells*, both of which recognize that the trial court has broad discretion over whether to allow additional evidence during the *de novo* hearing. *See Frye*, 671 S.W.2d at 469; *Wells*, 9 S.W.3d at 784. He argues, however, that this case presents a special "he said/she said" situation, in which the credibility of two witnesses is critical to a determination of a material fact, namely, whether the office incident actually occurred. Indeed, the ALJ stated that, without evidence of the office incident, the other evidence would not have led to a finding of sexual harassment "with a significant penalty." In assessing Stephens' and Williams' credibility, however, the ALJ found that Williams was the more credible of the two, because she "did not waiver as to the essential parts of her allegations." While the ALJ discredited one portion of Williams' testimony, finding that "[Stephens] did not slump down in his chair and rub his thighs . . ." the ALJ concluded that "[a]ll other components of the office incident are proven." Stephens argues that it was error for the trial court to hold that the ALJ "properly exercised her discretion" in terminating him without giving him the opportunity to testify before the trial judge. In the circumstance in which credibility is so critical to the resolution of the case, Stephens argues, the trial court was compelled to permit him to testify "live and in person" in its *de novo* review.

As noted in the prior appeal in this case, applying the appropriate standard of review does not mean that the aggrieved party is entitled to a new trial. Rather, the right to a *de novo* review "means a new hearing in the chancery court based upon the administrative record and any additional or supplemental evidence which either party wishes to adduce relevant to any issue." *Frye*, 671 S.W.2d at 469. The Court in *Frye* stated that "[t]he Chancellor may, of course, confine new evidence to that which is truly supplemental or additional and is not required to hear all of the evidence anew if he does not find this necessary." *Id.* Indeed, in this case, the trial court had previously entered an order stating that "neither party may call any witness who has previously testified," and that "evidence currently in the record may not be repeated." Stephens admits that the testimony he sought to proffer to the trial court is not "new" or "supplemental." On the contrary, he candidly asserts that he wants to testify in person to improve on the credibility determination made by the ALJ. However, the *Frye* court anticipated restricting the proof to "new evidence . . . which is truly supplemental or additional," because "[o]therwise there would be little need for the administrative transcript." *Id.* Under *Frye*, the trial court had broad discretion to restrict the evidence. We find no abuse of discretion in the trial court's denial of Stephens' motion to testify at the hearing on remand. Accordingly, the trial court's decision on this issue is affirmed.

Stephens next argues that the trial court erred in concluding that, considering the record as a whole, his suspension was supported by clear and convincing evidence.[5] In order to be clear and convincing, the evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992); *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). Such evidence should produce in the mind of the fact-finder a firm belief or conviction as to the truth of the allegations sought to be established. *O'Daniel*, 905 S.W.2d at 188; *Wiltcher v. Bradley*, 708 S.W.2d 407, 411 (Tenn. Ct. App. 1985). Arguing that the trial court erred, Stephens makes three points. First, he claims that his conduct, as a matter of law, did not rise to the level required to constitute sexual harassment. Next, he maintains that his participation in the office incident was not established by clear and convincing evidence, because it was supported only by Williams' uncorroborated testimony, which Stephens claims was not credible. Finally, he argues that the evidence did not establish that he was put on notice that the College was displeased with his general conduct towards his students.

Stephens maintains that his conduct did not rise to the level of sexual harassment, considering the fact that hostile environment consists of unwelcome sexual conduct that unreasonably interferes with an individual's performance or creates an intimidating, hostile, or offensive environment. In this case, he argues, the College did not establish by clear and convincing evidence that his conduct was so severe or pervasive as to create an objectively hostile or abusive educational environment, because the evidence showed that he made some innocuous verbal remarks to both female and male adult students. He asserts that Williams' interpretation of those comments was "unreasonable and in fact, bordered on the bizarre," and that her misinterpretation of one particular comment "frankly was ridiculous, and can only be viewed as unreasonable." Stephens argues that none of the comments were directed at Williams individually, and no proof was offered that the comments were motivated by gender animus. Thus, Stephens claims that his comments were not "shocking and pervasively sexually oriented."

Under the policies of the College and the Board of Regents, quoted above, sexual harassment is "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or educational experience or creating an intimidating, hostile or offensive work or educational environment." *See* Board of Regents Guideline P-080; College Policy PA-02-01. This definition mirrors the definition of sexual harassment applicable in cases filed pursuant to Title VII, 42 U.S.C. § 2000e-2(a)(1), and the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-401(a)(1). *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996). Under Title VII, the conduct "need not be clearly sexual in nature." *Campbell*, 919 S.W.2d at 32. However, the conduct must

---

[5]Under Tennessee Code Annotated § 49-8-303(4), the "clear and convincing" standard of proof is necessary in proceedings to terminate a tenured faculty member. It states that "[t]he burden of proof that adequate cause for termination exists shall be upon the institution, and shall be satisfied only by clear and convincing evidence in the record considered as a whole." Tenn. Code Ann. § 49-8-303(4) (2002).

be sufficiently "severe and pervasive" so as to create an objectively hostile environment, which is an environment that a reasonable person would find hostile or abusive. ***Id.*** (citing ***Harris v. Forklift Sys., Inc.***, 510 U.S. 17, 21 (1993)). "In determining whether an environment is hostile or abusive, a court must consider a totality of the circumstances." ***Id.***; ***see also*** College Policy PA-02-01.

Here, Stephens ridicules Williams' interpretation of his remarks to students during and outside of class, glosses over evidence of his practice of massaging and otherwise touching students, and minimizes his persistent sexual innuendo. The ALJ and the trial court, however, were not required to accept Stephens' explanations of his conduct as innocuous and designed to "relax" students. Rather, the ALJ and the trial court were required to ascertain the reasonable reaction of the recipient of Stephens' conduct, rather than Stephens' glib explanation of his subjective intent. As evidenced by the repeated cautions about this very behavior that Stephens received, and apparently disregarded, the conduct may objectively be considered offensive and abusive, and relevant to whether Stephens created a hostile, intimidating, and offensive educational environment.

Likewise, Stephens seeks to completely discount the evidence of the office incident directed at Williams, relying on his contention that it just did not happen. Stephens claims that Williams' testimony on that issue is not credible for a variety of reasons, and that his own testimony regarding that incident should have been credited because other witnesses testified that he probably would not have been in his office during the time frame alleged by Williams.

On appeal, however, "[w]e will not overturn a trial court's credibility determinations 'absent clear and convincing evidence to the contrary.' " ***See Wells***, 9 S.W.3d at 783. The factfinder is in the unique position of observing the demeanor of witnesses and thereby assessing their credibility. ***See Price v. Tennessee Civil Serv. Comm'n***, No. 01A01-9508-CH-00336, 1997 WL 203603, at *3 (Tenn. Ct. App. Apr. 25, 1997). Here, the ALJ articulated cogent reasons for crediting Williams over Stephens. She observed that Stephens' demeanor at the hearing was arrogant and overly confident, and that his tone of voice and body language suggested that he found it hard to take the hearing seriously. The ALJ described Williams' demeanor as nervous, tearful, worn, and frightened, but nevertheless confident in her allegations. While the ALJ did not credit an isolated portion of Williams' testimony regarding the office incident, the remainder of her testimony was credited. We find that the ALJ did not abuse her discretion in doing so. Considering the cumulative effect of the office incident and Stephens' other conduct, we must conclude that the ALJ did not err in finding that Stephens' conduct unreasonably interfered with Williams' academic performance and created an intimidating, hostile, or offensive educational environment.

Finally, Stephens argues that the evidence did not establish that he was put on notice that the College was displeased with his general conduct towards his students. As noted above, Stephens was aware of the College's sexual harassment policies, was repeatedly told that students had informally complained that his conduct was offensive, and was cautioned that his behavior could be considered to be in contravention of the College's policies. Alas, these cautions went unheeded. Despite this, it is clear that Stephens was on notice that his conduct was unacceptable. Under all of these circumstances, we conclude that the trial court did not err in affirming the decision of the ALJ.

The decision of the trial court is affirmed. Costs are to be taxed to the appellant, Ken Stephens, and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, J.